IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Derek A. Stewart, | : | |
| Plaintiff, | : | Civil Action 2:13-cv-741 |
| v. | : | Judge Smith |
| Commissioner of Social Security, | : | Magistrate Judge Abel |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

Plaintiff Derek A. Stewart brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits. This matter is before the Magistrate Judge for a report and recommendation on the administrative record and the parties' merits briefs.

**Summary of Issues.** Plaintiff Stewart maintains that he became disabled on July 20, 2009, at age 21, because he si unable to read, is mentally handicapped, and has back pain. (*PageID* 209 and 224-29.)

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge's analysis regarding whether plaintiff's impairment equals Listing 12.05C was procedurally deficient and not supported by substantial evidence;

- The administrative law judge failed to give the limitations found by nurse practitioner Pamela Suver the consideration required by Social Security Rule ("SSR") 06-03p.

**Procedural History.**  Plaintiff Stewart filed his application for supplemental security income on March 31, 2010, alleging that he became disabled on July 20, 2009, at age 21.  (*PageID* 192-95.)  The applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On January 17, 2012, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (*PageID* 81-99.)  Plaintiff's mother, Vicki Saxton, and a vocational expert also testified.  (*PageID* 100-06; 107-13.)  On February 21, 2012, the administrative law judge issued a decision finding that Stewart was not disabled within the meaning of the Act.  (*PageID* 55-71.)  On June 3, 2013, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (*PageID* 37-39.)

**Age, Education, and Work Experience.**  Stewart was born on April 11, 1988.  (*PageID* 69, 204.)  He has a tenth grade, "limited" education.  (*PageID* 70, 210.)  Stewart has no past relevant work.  (*PageID* 69, 196-201.)

**Plaintiff's Testimony.**  Plaintiff Derek Stewart gave the following testimony. He has his driver's license and drives his mother's car once or twice a week, sometimes to a friend's house or just around town.  (*PageID* 82.)  He has never driven on the freeway.  (*PageID* 82-83.)  Stewart finished the tenth grade and claimed he does not read well.  (*PageID* 83.)  To obtain his driver's license he took a verbal test.  (*Id.*)  It took him two tries to pass the test.  (*PageID* 95.)

Stewart can read only certain things on paper but not the newspaper. (*PageID* 83.) Although he cooks microwave pizzas, he cannot read the instructions–"I just throw it in." (*PageID* 84.) When he drives, he cannot read street signs and stays in town because he cannot read directions. He goes grocery shopping with his mother. If she sent him to the store with a simple list of items, he would be able to shop on his own. (*Id.*) He can do addition and subtraction. When shopping, he would know whether he had enough money to purchase an item, but he would not know how much change he should receive. (*PageID* 88-89.)

Stewart spends the day on the couch watching television or listening to music. (*PageID* 92, 99.) If he gets hungry he microwaves something or ask his neighbor, a friend of his moms, to cook him something. (*PageID* 92-93.) He does not cook because he will catch it on fire and has almost burnt his house down. (*PageID* 93.)

Stewart has difficulties with paying attention and focusing. He is easily distracted. He dropped out of school due to his frustrations with math and reading. (*PageID* 94-95.)

Stewart testified said that he did not really know what was wrong with his back. His mother knew more about it than he did. He did say that he feels constant pain in the middle of his back. (*PageID* 89.) The pain keeps him up at night and bending makes it worse. He takes Tramadol for his back pain. (*PageID* 92.) Laying down helps, so he spends a good part of the day lying down. (*PageID* 90.) He naps about two or three hours a day. (*Id.*) He estimated that he could sit for about ten to fifteen minutes, walk

one block, stand ten to fifteen minutes before needing to take a break, and lift and carry about a gallon of milk. (*PageID* 91.)

The administrative law judge fairly summarized the testimony of Vickie Saxton, Stewart's mother, as follows:

> [C]laimant was not capable of filling out any paperwork.  According to her, the claimant could not function on his own, he would not be capable of taking care of himself on his own.  She testified that he had received Supplemental Security Income for being mentally handicapped.  He has trouble with doing just about everything around the house, therefore she tries not to ask him to do very much.  She does his laundry and picks up after him at times because she knows he is in pain.  He caused a "smoke fire" once by leaving grease on the stove, so he does not cook any longer.  She works five days a week, and the claimant is generally home by himself, however her best friend that lives three doors down feeds him and "keeps an eye" on the claimant for her.  She stated that he dropped out of school after being passed on to the eleventh grade.  She claimed he did not socialize with others, but might see a friend two or three times a week.

(*PageID* 69.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

<u>Educational records.</u>

Records from the New Lexington City Schools show that Plaintiff attended special education classes.

When Plaintiff was in the tenth grade at 16 years old, an Evaluation Team Report was prepared to determine his continued eligibility for special education services. (*Page-*

*ID* 279-82.) Stewart had participated in the Cognitive Disabilities program since he was in first grade. He completed evaluations in 1996, 1999, and 2002. The Wechsler Intelligence Scale for Children- Third Edition (WISC-III) was administered to Stewart in 1996 and in 1999. His performance was very consistent on both administrations. His overall ability fell within the Low to Very Low range. Stewart obtained a full scale IQ of 69 during a 1996 WISC-III and a full scale IQ of 70 during administration of the test in 1999. (*PageID* 281.) Academically, Stewart's most recent evaluation indicated that reading skills, reading comprehension, math calculation and written language skills were assessed in the very low range with his standard score below 69. Math reasoning skills were assessed in the Low Average range with standard scores of 80, 89. With regard to adaptive behavior, Stewart demonstrated deficits in the areas of communication, daily living skills and socialization on the Vineland Adaptive Behavior Scales. He also demonstrated deficits in the areas of communication, community use, functional academics, school living, health and safety, leisure self-care, self-direction and social skills on the adaptive behavior assessment system. (*Id.*)

In April 2006, Stewart had an IEP (Individualized Education Program) prepared for the 2006/2007 academic school year, the focus of which was on transition services and construction trades. (*PageID* 271-78.) Plaintiff was described as an 18-year-old student who was identified as having a cognitive disability, which affected all areas of academic performance. Stewart was significantly below grade level in the areas of reading, writing and mathematics. Stewart had been enrolled in intervention specialist

pullout academic classes for the 2005-06 school year. Stewart had been enrolled in the Construction Trades program and had earned mainly passing grades. Stewart would have to attend after school classes and/or summer school in order to make up the credits needed to graduate. Stewart could be easily distracted to off task behavior by peers. Stewart was not always highly motivated to complete academic class assignments. (*PageID* 271.)

Stewart's high school transcript was also included in the record. Stewart attended New Lexington High School until the eleventh grade. (*PageID* 268.) On February 28, 2007, Stewart was withdrawn from high school as he was 18 years old and had poor attendance. (*PageID* 270.)

Charles Loomis

On October 22, 2008, Stewart was consultatively examined by Mr. Loomis on behalf of the state agency. (*PageID* 285-91.) Stewart indicated that he was unable to work because of his inability to read and write. (*PageID* 288.) Stewart's level of speech appeared to reflect his overall intellectual functioning. There was some poverty of content but no indication of circumstantiality, tangentially, or looseness of associations. (*PageID* 287.) Affect was within normal limits and there was no indication of a mood disturbance. (*Id.*) Motor signs of anxiety were absent. There were no autonomic manifestations reported. (*Id.*) Contact with reality appeared to be within normal limits. There was no evidence of a loosening of associations, flight of ideas, delusions of reference, hallucinations or confusion. (*Id.*) Stewart was oriented to person, place; date and

situation.  He was able to recall two of three objects after five minutes.  He received credit on one of the arithmetic problems presented.  He received credit on the mental control task of counting backwards from 20 to 1 but was unable to perform the task of Serial 3's.  He was able to recall five digits forward and three digits backward.  (*PageID* 287-88.)  Stewart reported that he did not get up until late morning.  He performed few household chores other than taking the trash out and using the weed eater to trim the lawn.  He did have an operators license that he obtained by taking the written test on three occasions.  (*PageID* 288.)

Stewart took the Wechsler Adult Intelligence Scale - 3rd Edition (WAIS-III) which resulted in a verbal IQ of 71, a performance IQ of 87, and a full scale IQ of 78.  (*PageID* 288.)  The Nelson Reading Test yielded a reading grade performance of 2.1. suggesting that Stewart is illiterate.  (*PageID* 289.)

Mr. Loomis concluded that functional intelligence as tested placed Stewart in the borderline range.  Neuropsychological screening suggested a low average performance.  Clinically,  Mr. Loomis found Stewart presented with no significant mental health issues.  Functionally he drove and had some interpersonal relationships.  (*Id.*)

Mr. Loomis diagnosed Stewart with a reading disorder and borderline intellectual functioning.  (*PageID* 290.)  He assigned Stewart a Global Assessment of Functioning (GAF) score of 65, indicating mild symptoms.  Mr. Loomis opined that Stewart was not impaired in his ability to relate to others, understand, remember and follow routine

instructions, maintain attention and concentration to task or cope with ordinary stress and pressures of competitive work. (*Id.*)

Family HealthCare, Inc./Certified Nurse Practitioner Pamela Suver

CNP Suver has treated Stewart since at least August 2008. (*PageID* 294-302, 306-08.) On January 6, 2012, she assessed Stewart as being able to stand or walk for 10 minutes at one time and sit for 20 minutes at one time. He could rarely lift up to 20 pounds in an eight-hour workday. (*PageID* 311.) Mentally, she found Stewart to have moderate to marked limitations in social interaction, sustained concentration and persistence, and adaptation abilities. (*PageID* 312-14.) CNP Suver based her opinion on Stewart's mild mental retardation and developmental delay, back pain and irritation with others. (*PageID* 314.)

Kristen Haskins, Psy.D./Bruce Goldsmith, Ph.D. After reviewing the record on June 23, 2010, Dr. Haskins, a state agency psychologist, found Stewart was mildly limited in his activities of daily living and in maintaining social functioning; and moderately limited in maintaining concentration, persistence, and pace. Stewart had no episodes of decompensation. (*PageID* 119.) Dr. Haskins found Stewart to be partially credible noting that even though Stewart indicated a total inability to read, prior testing he indicated he did have the ability to read at a low level, was able to obtain a driver's license, fill out medical forms, and go out into the community. (*PageID* 120.) The file was reviewed on October 11, 2010 by state agency psychologist, Bruce Goldsmith, Ph.D. who affirmed Dr. Haskins's assessment. (*PageID* 131, 135.)

**Administrative Law Judge's Findings.** The administrative law judge found that:

1. The claimant has not engaged in substantial gainful activity since March 31, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: degenerative disc disease of the thoracic spine, borderline intellectual functioning and a reading disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, [the administrative law judge] find[s] that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can frequently climb ladders, ropes, scaffolds, stairs and ramps and occasionally stoop. Regarding mental limitations, the claimant retains the capacity for simple repetitive tasks in a relatively static environment where interruptions are infrequent, changes are infrequent and can be explained, and the work does not require independent prioritization of tasks. Moreover, due to his literacy difficulties, the claimant is best suited for work where instructions can be provided orally and tasks can be learned by demonstration.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on April 11, 1988 and was 21 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and can communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

>   numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).
>
> 10. The claimant has not been under a disability, as defined in the Social Security Act, since March 31, 2010, the date the application was filed (20 CFR 416.920(g)).

(*PageID* 60-71.)

**Standard of Review**. Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" (*Id.*) *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.** Stewart argues that the decision of the Commissioner

denying benefits should be reversed because the administrative law judge's analysis regarding whether his mental impairment equals Listing 12.05C was procedurally deficient and not supported by substantial evidence.  According to Stewart, the administrative law judge refused to evaluate the IQ scores contained in Stewart's educational records and the administrative law judge refused to address the results of standardized measures of adaptive functioning which readily satisfied the listing requirement for onset of intellectual disability before age 22.  (Doc. 15 at *PageID* 326-32.)

Plaintiff also contends the administrative law judge violated SSR 06-03p by not citing to and/or discussing the factors identified in SSR 06-03p when discussing the opinion of CNP Pam Suver.  (*Id.* at *PageID* 333-35.)

**Analysis.**  In evaluating psychiatric impairments, the Commissioner's regulations provide that the fact finder should consider such factors as the claimant's ability to understand, carry out, and remember simple instructions, to respond appropriately to supervision, co-workers and usual work situations, and to deal with changes in a routine work setting.  20 C.F.R. §416.921(b)(3), (5), (6).  Disability is to be sequentially evaluated.  If the claimant is not currently engaged in substantial gainful activity and has a severe impairment, the Commissioner must determine whether the impairment meets or equals an impairment in Subpart P, Appendix 1. 20 C.F.R. §416.920(d).  The signs and symptoms which would support a determination, on the basis of the psychiatric evidence alone without reference to the claimant's age, education, and work experience, that he suffers from a totally disabling psychiatric impairment are set out in §§12.01 through

12.09, Subpart P, Appendix 1, Listing of Impairments. The presence or absence of these and similar signs and symptoms is controlling, not an individual physician's opinion on the ultimate issue of disability. 20 C.F.R. §§416.913(b), (c), (d), 416.926(b), and 416.927.

In determining whether a claimant is disabled, an administrative law judge must consider whether the claimant's impairments meet Social Security Listing requirements. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(a)(4)(iii). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. § 416.920(d). A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."). *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The claimant shoulders the burden of producing medical evidence that establishes that all of the elements are satisfied. It is not sufficient to come to close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 416.926(c).

Listing 12.05C provides in pertinent part:

The structure of the listing for mental retardation (12.05) is different from

12

> that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in § 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in § 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.
>
> 12.05 *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

In addition to requiring significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (before age 22), Listing 12.05 also requires a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function.

The Listing also requires that deficits in adaptive functioning appear during the developmental period. The records from New Lexington City Schools make it very clear that this was the case.

13

In assessing Stewart for special education under the Individuals with Disabilities Education Act, the evaluation team reported when Stewart was 16 years of age, in October 2004, that with regard to adaptive behavior, Stewart demonstrated deficits in the areas of communication, daily living skills and socialization on the Vineland Adaptive Behavior Scales. He also demonstrated deficits in the areas of communication, community use, functional academics, school living, health and safety, leisure self-care, self-direction and social skills on the adaptive behavior assessment system. (*PageID* 281.) The team consisted of teachers, counselors, school psychologist, etc. Their observation of adaptive deficits would be credible.

Stewart was administered IQ test in 1996 and 1999 which resulted in a full scale IQ of 69 during a 1996 WISC-III test and a full scale IQ of 70 during administration of the test in 1999. (*PageID* 281.) In October 2008, Mr. Loomis administered the WAIS-III, IQ test, which resulted in a verbal IQ score of 71.[1]

While the IQ test administered by Mr. Loomis placed Stewart in the "borderline" category, the earlier tests clearly placed Stewart in the "mildly retarded" category. None of the tests were considered invalid and thus, all must be considered valid. Moreover, the test scores cannot be considered in a vacuum. "In assessing the validity of a claimant's IQ, '[i]nformation from both medical and nonmedical sources may be used to

---

[1]Pursuant to 20 C.F.R. Pt. 404, Subpt. 1, App.1 § 12.00 D, "[i]n cases, where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance and fill-scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."

14

obtain detailed descriptions of the individual's activities of daily living; social functioning, concentration, persistence and pace; or ability to tolerate increased mental demands (stress). '" *Brown v. Secretary of H.H.S.*, 948 F.2d 268,269 (6th Cir. 1991)(citing 20 C.F.R. PI. 404, Subpt. P, App. I, § 12.00 D).  The administrative law judge chose to credit the 2008 IQ test scores over those of the other two tests which placed Stewart in the mildly retarded range.  However, in reaching that decision the administrative law judge did not discuss Stewart's education records or previous IQ test results.

    The administrative law judge cited the fact that Stewart performed household chores, cleaned his truck, and did lawn work.  (*PageID* 62.)  Stewart also drove two to three days a week and was able to prepare simple meals.  (*Id.*)  The administrative law judge also cited that though Stewart testified that he had trouble getting along with other people, he was able to go grocery shopping and to yard sales with his mother. (*Id.*)  One must be careful in accepting as true what persons with mental and/or intellectual deficits say they can do, because, incredibly, they sometimes lose track of the fact that the requested finding is one of disability, not enhancement of self-worth.  So one must investigate a statement by a claimant that he can, for instance, , mow the lawn, with qualifiers, such as (1) over what distance? (2) with what type of mower? (3) how long without breaks? and (4) with what degree of objective success?

    The DSM-III-R describes mild mental retardation as follows:

> Mild mental retardation is roughly equivalent to what used to be referred
> to as the educational category of "educable," This group constitutes the
> largest segment of those with the disorder - about 85%.  People with this

15

> level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5), have minimal impairment in sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

DSM-III-R § 317.00. As the court in *Brown* found, the Commissioner, in promulgating Listing 12.05 C, expressly singled out individuals with Mild Mental Retardation for special treatment in determining entitlements to disability benefits. 948 F.2d at 270. So too, Stewart's IQ scores, with the exception of the 2008 scores, indicate mild mental retardation and his activities of daily living, as well as his education and employment history, fit within the DSM-III-R characterization of a mildly mentally retarded individual.

In addition, the Listing requires an additional and significant limitation of function and Stewart's back problem is the obvious deficit to be analyzed here. Medical records demonstrate that he complained of back pain for over a year in August 2008. (*PageID* 299.) The record shows Stewart's complaints continued through at least September 2010. (*PageID* 294-302, 306-08.) An MRI of the thoracic spine taken in September 2008 revealed focal right paracentral right hard disc osteophyte complex at T9-10 with deformity of the thecal sac and spinal cord without cord displacement or edema; small left paracentral disc protrusion at T8-9 without significant mass effect of the thecal sac

16

or cord; and small hard disc osteophyte complex at T10-11. (*PageID* 300-01.) Thus there really is no legitimate question at all that Stewart had degenerative disc disease of the thoracic spine, and that it is a significant work-related functional deficit. Moreover, the administrative law judge found Stewart's degenerative disc disease of the thoracic spine to be a severe impairment for Social Security purposes. (*PageID* 60.) As such, the Magistrate Judge finds that Stewart's degenerative disc disease of the thoracic spine, constitutes the necessary "physical impairment which imposes an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05C.

The administrative law judge rejected the opinion of CNP Suver on the basis that she was not an acceptable medical source:

> On January 6, 2010 Certified Nurse Practitioner Pamela Suver, identified possibly more restrictive physical and mental limitations than those assessed herein. Specifically, Ms. Suver indicated the claimant could stand for ten minutes at a time, walk for ten minutes at a time and sit for twenty minutes at a time; rarely lift up to twenty pounds in an eight-hour workday; perform simple grasping and fine manipulation. Regarding the claimant's mental abilities, Ms. Suver indicated the claimant had moderate to marked limitations in social interaction; sustained concentration and persistence and adaptation abilities (Exhibit 7F). However, a nurse practitioner's opinion is not an "opinion" of a "medical source," as defined in 20 CFR §§416.902 and 404.1527(a)(2), nor is it an "opinion" of an "acceptable medical source," as defined in 20 C.F.R. § §404.1513. Because a nurse practitioner does not qualify under either of these definitions, their opinions are, pursuant to 20 CFR §404.1527 not "medical opinions." Given this, an opinion from a non-acceptable medical source is considered only to the extent that it helps understand how an impairment affects the ability to work (see 20 CFR §404.1514(e)). Thus, Ms. Suver's opinions regarding the claimant's physical and mental limitations were given some consideration in assessing the claimant's residual functional capacity.

(*PageID* 66.)  This statement reflects a misunderstanding of the regulations. Section 404.1513 of title 20 of the Code of Federal Regulations states:

> In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work.  Other sources include, but are not limited to--
>
> (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists). . . .

20 CFR § 404.1513(d)(1).  Only "acceptable medical sources" can be considered a treating source whose opinion may be entitled to controlling weight.  SSR 06-03p; 20 C.F.R. § 416. 927(d).  Evidence from other sources, however, may be used to demonstrate the severity of an impairment or how it impacts that individual's ability to function.  Social Security Ruling 06-03p states:

> For opinions from sources such as teachers, counselors, and social workers who are not medical sources, and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.
>
> An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source.  For example, this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of the individual's functioning over time and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole.

18

SSR 06-03p at *5-6. Here, the administrative law judge was under the mistaken belief that CNP Suver's opinion could be given no weight because she was not an acceptable medical source. As a result, he failed to evaluate her opinion and consider all the evidence in the record.

In conclusion, the Magistrate Judge finds the administrative law judge's decision is not supported by substantial evidence and should be **REMANDED** for further proceedings consistent with this Report and Recommendation. On remand, the administrative law judge should evaluate the evidence with respect to plaintiff's mental impairments, compare it to the Listings and provide a rationale for his decision to allow for meaningful judicial review; and evaluate CNP Suver's opinion in accordance with Social Security Ruling 06-03p.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v.*

*Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

                 s/Mark R. Abel
                 United States Magistrate Judge